FLANDERS INDUSTRIES, INC v STATE OF MICHIGAN

Docket No. 157532. Submitted October 20, 1993, at Detroit. Decided December 20, 1993, at 9:05 A.M.

Flanders Industries, Inc., brought an action in the Menominee Circuit Court against the State of Michigan, seeking with respect to its potential liability for cleaning up contaminated sediments on the bottom of Lake Michigan a declaration that liability for any clean-up costs lay with the defendant, contribution from the defendant for any liability it might have for any clean-up costs, and injunctive relief. The court, Francis D. Brouillette, J., granted summary disposition for the defendant, dismissing the plaintiff's complaint in its entirety. The plaintiff appealed.

The Court of Appeals *held:*

The trial court properly granted summary disposition for the defendant.

1. The Michigan Environmental Response Act (MERA), MCL 299.601 *et seq.*; MSA 13.32(1) *et seq.,* provides for the identification of environmental contamination and for response activities relative to that contamination, including the imposition of financial liability on those responsible for the contamination. However, the act does not provide for preenforcement judicial review. The act is similar in intent to the Comprehensive Environmental Response, Compensation, and Liability Act, 42 USC 9601 *et seq.,* which has been construed to deny declaratory relief because such relief would be inconsistent with the remedial nature of the act. The same analysis applies to the Michigan act. Accordingly, the trial court lacked jurisdiction to grant the requested declaratory relief relative to financial liability under the MERA.

2. If the plaintiff were found to be liable for clean-up costs pursuant to the MERA, that liability would arise as a successor corporation of the corporation that caused the release of the

REFERENCES

Am Jur 2d, Declaratory Judgments §§ 68 *et seq.*; Pollution Control §§ 589 *et seq.*

See ALR Index under Declaratory Judgments or Relief; Environmental Law; Jurisdiction.

contamination into Lake Michigan. Accordingly, for the purpose of determining the plaintiff's liability for clean-up costs, the defendant's alleged ownership of the lake bottom lands on which the contamination is now found is irrelevant.

3. The plaintiff failed to plead an action for declaratory and equitable relief under the Michigan Environmental Protection Act, MCL 691.1201 *et seq.*; MSA 14.528(201) *et seq.*, because it did not allege that the defendant was about to endanger the air, water, or other natural resources by pollution, impairment, or destruction as required to maintain an action under the MEPA. The substance of the plaintiff's claims was to avoid monetary liability for clean-up costs, while the MEPA is intended to halt future pollution.

4. Although the defendant owned the contaminated lake bottom land for a portion of the time that the contamination was being released into the lake, that ownership was the result of the defendant's assumption of ownership from the federal government on its admission to the union and was acquired solely in its function as a sovereign. Acquisition of ownership of the bottom lands under those circumstances was involuntary within the meaning of § 3(u)(ii) of the MERA, MCL 299.603(u)(ii); MSA 13.32(3)(u)(ii). Accordingly, the defendant is not an owner of the land within the meaning of the MERA and is not liable to contribute to the cost under § 12c(3), MCL 299.612c(3); MSA 13.32(12c)(3).

5. The plaintiff lacked both jurisdiction and standing to bring a citizen's action for injunctive relief under § 15 of the MERA, MCL 299.615; MSA 13.32(15). The plaintiff failed to give to the required parties notice of its intent to sue, as required by the notice provision of that section, and the failure to give proper notice of the intent to sue under that section is jurisdictional. Further, even if the notice had been in compliance with the requirements of the statute, the plaintiff failed to state facts sufficient for a claim under that section.

Affirmed.

1. ENVIRONMENT — COURTS — JURISDICTION — MICHIGAN ENVIRONMENTAL RESPONSE ACT — DECLARATORY RELIEF.

A circuit court lacks jurisdiction to hear an action for declaratory relief with respect to a determination of liability for the costs of response activities pursuant to the Michigan Environmental Response Act; a determination of that liability can be made only after the Department of Natural Resources has instituted an action to recover those costs (MCL 299.601 *et seq.*; MSA 13.32[1] *et seq.*).

2. ENVIRONMENT — MICHIGAN ENVIRONMENTAL RESPONSE ACT —
    RESPONSE ACTIVITIES — OWNERSHIP OF LAND.

   Ownership of land on which contaminants are found is not a
      prerequisite for liability under the Michigan Environmental
      Response Act for expenses incurred for response activities to
      clean up the contamination; liability for expenses for response
      activities of an owner of a polluting facility arises from the
      release of contaminants by the facility rather than the owner-
      ship of the land upon which the contaminants may accumulate
      (MCL 299.603[m]; MSA 13.32[3][m]).

3. ENVIRONMENT — CONTRIBUTION — MICHIGAN ENVIRONMENTAL RE-
    SPONSE ACT — STATE OF MICHIGAN.

   The State of Michigan is not liable for contribution for response
      activity expenses arising under the Michigan Environmental
      Response Act with respect to contamination accumulated on
      lake bottom lands to which the state acquired title from the
      United States on admission of the state to the union (MCL
      299.603[u][ii], 299.612c[3]; MSA 13.32[3][u][ii], 13.32[12c][3]).

*Dickinson, Wright, Moon, Van Dusen & Free-
man* (by *H. G. Sparrow, III* and *Dustin P. Ordway*)
(*Barstow, Selsor & Hoffman, P.C.* by *L. Grant
Selsor,* of Counsel), for the plaintiff.

*Frank J. Kelley,* Attorney General, *Thomas L.
Casey,* Solicitor General, and *Jeremy M. Firestone*
and *Gary L. Finkbeiner,* Assistant Attorneys Gen-
eral, for the defendant.

Before: CORRIGAN, P.J., and NEFF and R. J. CO-
LOMBO, JR.,* JJ.

CORRIGAN, P.J. In this action for declaratory
judgment and other relief, pursuant, in part, to
Michigan's Environmental Response Act (MERA),
MCL 299.601 *et seq.*; MSA 13.32(1) *et seq.,* plaintiff
appeals as of right the grant of summary disposi-
tion pursuant to MCR 2.116 (C)(4) (lack of subject
matter jurisdiction), MCR 2.116 (C)(5) (lack of

---

* Circuit judge, sitting on the Court of Appeals by assignment.

standing), and MCR 2.116 (C)(8) (failure to state a claim on which relief may be granted).[1] We affirm.

In December 1982, plaintiff purchased an industrial plant on the shores of Green Bay, Lake Michigan, in Menominee County. The plant had been owned and operated from 1940 until 1982 by the Heywood-Wakefield Company, a furniture manufacturer. Heywood-Wakefield obtained a portion of the Lake Michigan bottom land from the state in 1961, pursuant to § 3(1) of the Great Lakes Submerged Lands Act (GLSLA), 1955 PA 247, § 3(1); MCL 322.703(1); MSA 13.700(3)(1).[2] The state itself had acquired ownership of the bottom lands of Lake Michigan's navigable waters when it joined the union in 1837.[3]

Heywood-Wakefield filed for bankruptcy protection before plaintiff purchased the plant. Unknown to plaintiff, Heywood-Wakefield had discharged paint sludge generated during manufacturing directly into Green Bay. As a result, a part of Green Bay's bottom lands became contaminated. In addi-

---

[1] The trial's court's opinion and order did not identify which court rules formed the basis of its dismissal of each count. We have identified the appropriate subsections of MCR 2.116(C) in our discussion. The mislabeling of a motion does not preclude review where the lower court record otherwise permits it. *Wilson v Thomas L McNamara, Inc,* 173 Mich App 372, 376; 433 NW2d 851 (1988).

[2] Subsection 1 of § 3, as amended by 1982 PA 68, provided in part that

"the department of natural resources, . . . after finding that the public trust in the waters will not be impaired or substantially affected, may enter into agreements pertaining to waters over and the filling in of submerged patented lands, or to lease or deed unpatented lands, after approval of the state administrative board. Quitclaim deeds, leases, or agreements may be issued or entered into by the department with any person, firm, or corporation, public or private, or the United States of America covering unpatented lands, and shall contain such terms and conditions and requirements which shall be deemed just and equitable and in conformity with the public trust as determined by the department."

[3] 5 Stat 49, ch XCIX(2) (1836); 5 Stat 144, ch VI (1837).

tion, sludge stored in barrels near the lake shore had also seeped into the water and settled on the lake bottom.

On March 28, 1989, the Department of Natural Resources notified plaintiff that it was considered a "potentially responsible party," subject to liability for remediating the contamination under MCL 299.601 *et seq.*; MSA 13.32(1) *et seq.,* the MERA. Plaintiff subsequently incurred expenses in inspecting, testing, monitoring, and removing the paint sludge from the area.

On March 26, 1992, plaintiff filed its initial complaint against the state in the Menominee Circuit Court. The counts were entitled "Declaratory Judgment under GLSLA" (which sought a declaration that plaintiff was not liable for cleaning up the contaminated bottom lands on several theories), "Contribution under MERA," and "Declaratory Judgment under MERA." The third count included a statement in ¶ 45 that plaintiff "avers that it may also be entitled to relief pursuant to MERA § 15 and it here gives defendant sixty days' notice in writing of [plaintiff's] intent to sue." Plaintiff later filed an amended complaint that included a fourth count, "Citizens Suit under MERA," requesting injunctive and other relief. The amended complaint indicated that ¶ 45 of the original complaint had provided defendant with the required sixty days' notice under MCL 299.615(3) (a)(iii); MSA 13.32(15)(3)(a)(iii). Defendant immediately moved for summary disposition. After due consideration, the circuit court issued an order dismissing the entire complaint.

### I. DECLARATORY JUDGMENT

The count of plaintiff's complaint entitled "Declaratory Judgment under GLSLA" essentially

sought a determination that, for various reasons, plaintiff is not liable for the cost of cleaning up the Lake Michigan bottom land contaminated by Heywood-Wakefield. The circuit court declined to make such a determination, finding, first, that ownership of the bottom land was immaterial and, second, that the action was premature. We affirm the circuit court's analysis on both points.

The circuit court has jurisdiction over a claim for declaratory relief against the state. See, e.g., *Mooahesh v Dep't of Treasury,* 195 Mich App 551, 559; 492 NW2d 246 (1992). MCR 2.605(A)(1) empowers a court to enter a declaratory judgment "[i]n a case of actual controversy within its jurisdiction." Where no actual controversy exists, the circuit court lacks subject matter jurisdiction to enter a declaratory judgment. *Fieger v Comm'r of Ins,* 174 Mich App 467, 470; 437 NW2d 271 (1988), citing *Shavers v Attorney General,* 402 Mich 554, 558; 267 NW2d 72 (1978). An actual controversy will be found to exist only where a declaratory judgment is necessary to guide a litigant's future conduct in order to preserve the litigant's legal rights. *Id.*

Our review of a declaratory judgment is conducted de novo. *Englund v State Farm Mutual Automobile Ins Co,* 190 Mich App 120, 121; 475 NW2d 369 (1991). Cases brought under the Michigan Environmental Protection Act (MEPA), MCL 691.1201 *et seq.*; MSA 14.528(201) *et seq.,* which is similar in intent to the MERA, are also reviewed de novo. *Eyde v Michigan,* 82 Mich App 531, 540; 267 NW2d 442 (1978), citing *Ray v Mason Co Drain Comm'r,* 393 Mich 294, 303; 224 NW2d 883 (1975).

The MERA, 1982 PA 307, as amended by 1987 PA 166, 1989 PA 157, 1990 PA 233, and 1990 PA 234 (the so-called "polluters pay" law) is a complex statutory scheme intended, in the words of its

title, "to provide for the identification . . . of environmental contamination . . . [and] to provide for response activity" at such sites. Under the MERA, persons may become liable for costs ("response activity costs") incurred by the Department of Natural Resources in removing pollution. MCL 299.612; MSA 13.32(12). Although certain defenses are available in a state action for recovery of response costs, MCL 299.612a; MSA 13.32(12a), the act does not provide for preenforcement judicial review.

This case presents the novel question whether a litigant may obtain a declaratory judgment of nonliability under the MERA before the DNR has initiated a cost recovery action. We hold that declaratory relief is not available in these circumstances. Because the act is similar in intent to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 USC 9601 *et seq.*, we look for guidance to federal cases involving the same issue. See *Kelley v E I duPont de Nemours & Co,* 786 F Supp 1268, 1280 (ED Mich, 1992) (the MERA is "patterned after" the CERCLA).

A litigant has no right under the CERCLA to judicial review of the "selection and implementation of response actions prior to the completion of the response action or the commencement of EPA enforcement." *Cooper Industries, Inc v United States Environmental Protection Agency,* 775 F Supp 1027, 1037 (WD Mich, 1991). Although the Sixth Circuit Court of Appeals has not yet ruled on this question, courts of appeals of other circuits have found no right of judicial review before a cost recovery action has been brought. See, e.g., *Lone Pine Steering Committee v United States Environmental Protection Agency,* 777 F2d 882, 886-887 (CA 3, 1985) ("[t]he statutory approach to the problem of hazardous waste is inconsistent with

the delay that would accompany pre-enforcement review"); *Voluntary Purchasing Groups, Inc v Reilly,* 889 F2d 1380, 1389-1390 (CA 5, 1989) (legislative history supports reading the CERCLA to prevent review of liability before government's filing suit; "piecemeal" litigation would waste the EPA's time and resources); *Barnes v United States District Court,* 800 F2d 822, 822 (CA 9, 1986) (the CERCLA does not authorize pre-enforcement review of EPA orders); *Dickerson v Administrator, Environmental Protection Agency,* 834 F2d 974, 977 (CA 11, 1987) (the CERCLA precludes preenforcement review).

As one court put it: "It appears that with the dangers or potential dangers caused by hazardous substances, shooting first and asking questions later was the intent of Congress." *B R Mackay & Sons, Inc v United States,* 633 F Supp 1290, 1294 (D Utah, 1986). See also, e.g., *Cabot Corp v United States Environmental Protection Agency,* 677 F Supp 823, 828 (ED Pa, 1988) (cleanup could be delayed for years if parties were allowed to contest the EPA's choice of method).

"The statute is clear and unequivocal. Jurisdiction is absent unless timing is proper." *Apache Powder Co v United States,* 738 F Supp 1291, 1292 (D Ariz, 1990). We endorse the various federal courts' analyses of the timing provisions of the CERCLA and apply their analytic approaches in construing the MERA. The MERA, a remedial statute, must be interpreted to minimize delay in removing environmental contamination. If the DNR decides to institute a cost recovery action against plaintiff pursuant to MCL 299.616(1)(b); MSA 13.32(16)(1)(b), plaintiff will have ample opportunity to present the defenses outlined in its com-

plaint.[4] Before the commencement of such an action, a circuit court lacks jurisdiction to hear and decide the matter. Summary disposition under MCR 2.116(C)(4) (lack of subject matter jurisdiction), was proper.

Plaintiff did not need the circuit court's direction to "guide [its] future conduct in order to preserve [its] legal rights." *Fieger, supra* at 470. Plaintiff obviously did not and does not want to pay for the remediation of the contaminated site; however, at this stage, it does not require court intercession to preserve its rights. Its "right" to avoid liability for the clean-up costs can be determined just as effectively after the DNR has instituted a cost recovery action as before. Our conclusion, on review de novo, on this record is the same as the trial court's—no actual controversy yet existed at the time of the suit.

Plaintiff described the first count of its complaint as "Declaratory Judgment under GLSLA," seeking a declaration that the state and not plaintiff "owns" the contaminated bottom land. The circuit court properly found that such a determination would be of no legal importance in plaintiff's attempt to avoid liability under the MERA.

Section 3(u) of the MERA defines "owner" as "a person that owns a facility." MCL 299.603(u); MSA 13.32(3)(u). "Facility" means "any area, place, or property where a hazardous substance *has been released,* deposited, stored, disposed of, or otherwise comes to be located." MCL 299.603(m); MSA 13.32(3)(m) (emphasis supplied). It is undisputed that plaintiff owns the land where Heywood-Wakefield "released" the contaminants now at issue.

[4] Plaintiff asserted that (1) it was not a successor corporation to Heywood-Wakefield, (2) the contaminated bottom lands were not conveyed to plaintiff when it purchased Heywood-Wakefield's property on the shore, and (3) it was an innocent purchaser as defined in MCL 299.612a(1)(c); MSA 13.32(12a)(1)(c).

Plaintiff's possible liability for cleaning up the lake bottom is not independent of its possible liability for cleaning up the on-shore area, because the contaminants found on the bottom of the lake clearly originated in the Heywood-Wakefield "facility." Section 612(1)(b) assigns liability for costs to "[t]he owner or operator of the facility at the time of disposal of a hazardous substance." MCL 299.612(1)(b); MSA 13.32(12)(1)(b).[5] If plaintiff is found to be a successor corporation to Heywood-Wakefield, it may be liable for clean-up costs, whether or not it now owns the bottom land. In either case, the State of Michigan is not an "owner" for purposes of assigning liability under the MERA, a conclusion that will be discussed further *infra*.

In a portion of the first count of its complaint, plaintiff requested a declaration under the MEPA, MCL 691.1201 *et seq.*; MSA 14.528(201) *et seq.* Section 2 of that act, MCL 691.1202(1); MSA 14.528(202)(1), provides for "an action . . . for declaratory and equitable relief against the state . . . *for the protection of the air, water and other natural resources* and the public trust therein from pollution, impairment or destruction." (Emphasis added.) Plaintiff did not plead that defendant is about to endanger the "air, water [or] other natural resources" by "pollution, impairment or destruction," nor is there any evidence of a basis for such an allegation. Plaintiff thus failed to state a claim for declaratory and equitable relief under the MEPA.

Dismissal pursuant to MCR 2.116(C)(8) was proper. A motion under MCR 2.116(C)(8) tests the

[5] Disposal includes the "spilling, leaking, or placing of any hazardous substance into or on any land or water so that the hazardous substance or any constituent of the hazardous substance may enter the environment." MCL 299.603(h); MSA 13.32(3)(h).

legal sufficiency of a claim by the pleadings alone. *Feister v Bosack,* 198 Mich App 19, 21; 497 NW2d 522 (1993). All factual allegations supporting the claim are accepted as true, as well as any reasonable inferences or conclusions that can be drawn from the facts. *Id.* at 21-22. The motion should be granted only where the claim is so clearly unenforceable as a matter of law that no factual development could possibly justify a right of recovery. *Id.* at 22, citing *Wade v Dep't of Corrections,* 439 Mich 158, 163; 483 NW2d 26 (1992). In the present case, even if plaintiff succeeded in proving that defendant is the owner of the lake bottom, plaintiff will still not be entitled to the declaration of nonliability that it seeks. Summary disposition was properly granted.

## II. CONTRIBUTION

Plaintiff's second count asserted a right to "Contribution under MERA." MCL 299.612c(3); MSA 13.32(12c)(3) provides:

> A person may seek contribution from any other person *who is liable or may be liable* under [MCL 699.612; MSA 13.32(12)] during or following a civil action brought under this act. . . . This subsection shall not diminish the right of a person to bring an action for contribution in the absence of a civil action by the state under this act. [Emphasis added.]

Plaintiff argues that defendant "is or may be liable" under § 612 of the MERA. We disagree. In the MERA scheme, an owner of a facility may be liable for response costs. Standing alone, the statutory definitions of "owner" and "facility" would seem to include the State of Michigan. The state owned the bottom land during at least part of the

time during which Heywood-Wakefield was depositing its paint sludge there (i.e., approximately 1940 to 1961) and the definition of "facility" is broad enough to encompass even the bottom of a lake ("any area, place, or property where a hazardous substance . . . comes to be located").[6]

The MERA, however, contains an important limitation on this broad sweep of liability:

> . . . Owner does not include any of the following:
>
> *  *  *
>
> (ii) *The state or a local unit of government that acquired ownership or control of the facility involuntarily through* bankruptcy, tax delinquency, abandonment, or other *circumstances in which the government involuntarily acquires title or control by virtue of its governmental function,* a local unit of government to which ownership or control of the facility is transferred by the state, or the state or a local unit of government that acquired ownership or control of the facility by seizure, receivership, or forfeiture pursuant to the operation of law or by court order. In case of an acquisition described in this subparagraph by the state or a local unit of government, owner means any person who owned or controlled activities at the facility immediately before the state or local unit of government acquired ownership or control. The exclusion provided in this subparagraph shall not apply to the state or a local unit of government that caused or contributed to the release or threat of a release from the facility. [MCL 299.603(u)(ii); MSA 13.32(3)(u)(ii); emphasis supplied.]

---

[6] Plaintiff's argument that the lake bottom was not a facility because defendant acquired title to it before it was contaminated is unconvincing. A "facility" includes "any area . . . where a hazardous substance . . . *comes to be located.*" MCL 299.603(m); MSA 13.32(3)(m) (emphasis added). Hazardous substances may "[come] to be located" either before or after the moment in time when the owner acquires the property.

It is undisputed that defendant owned the bottom land in question at least until the 1961 conveyance to Heywood-Wakefield. Title and dominion over the lands covered by the Great Lakes' waters and within a state's boundaries belong to the state within which those lands are located. *People v Massey,* 137 Mich App 480, 485; 358 NW2d 615 (1984). These lands are held, not in a proprietary capacity by the state, but in trust, in a sovereign governmental capacity, for the public. *Oliphant v Frazho,* 5 Mich App 319, 322; 146 NW2d 685 (1966), rev'd on other grounds 381 Mich 630; 167 NW2d 280 (1969).

Title to the submerged bottom lands came to the state upon its admission to the union. *Oliphant v Frazho,* 381 Mich 630, 634; 167 NW2d 280 (1969). See also *Klais v Danowski,* 373 Mich 262, 274-275; 129 NW2d 414 (1964) (the United States had power to convey lake bottom land held in trust); *Jeffries v State ex rel Director, Dep't of Conservation,* 373 Mich 287, 288-289; 129 NW2d 426 (1964) (property owners who received land patent before Michigan was admitted to union now own bottom land that became submerged after patent was issued). The issue is whether Michigan's acquisition of the bottom lands upon its entry into the union was "involuntary" as that term is used in § 603(u)(2).

An action performed under duress is, of course, involuntary. Black's Law Dictionary (rev 4th ed), p 961. It does not follow, however, as plaintiff would have it, that an action must have been "performed under duress" to be "involuntary." An involuntary action is one performed "without the will to do it." *Id.*

The comparable portion of the CERCLA is very close in wording to the Michigan provision:

*The term "owner* or operator" *does not include a*

*unit of State or local government which acquired ownership or control involuntarily through* bankruptcy, tax delinquency, abandonment, or other *circumstances in which the government involuntarily acquires title by virtue of its function as sovereign.* The exclusion provided under this paragraph shall not apply to any State or local government which has caused or contributed to the release or threatened release of a hazardous substance from the facility, and such a State or local government shall be subject to the provisions of this chapter in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under section 9607 of this title. [42 USC 9601(20) (D); emphasis supplied.]

*Pennsylvania v Union Gas Co,* 491 US 1, 13; 109 S Ct 2273; 105 L Ed 2d 1 (1989), recognized that the CERCLA "rescues the States from liability where they obtained ownership of cleanup sites involuntarily." The Environmental Protection Agency's interpretation of the phrase "involuntarily acquires title by virtue of its function as sovereign" provides persuasive authority for our construction:

(a) Governmental ownership or control of property by involuntary acquisitions or involuntary transfers within the meaning of CERCLA section 101(20)(D) . . . includes, *but is not limited to:*

(1) Acquisitions by or transfers to the government *in its capacity as a sovereign,* including transfers or acquisitions pursuant to abandonment proceedings, or as the result of tax delinquency, or escheat, or other circumstances in which *the government involuntarily obtains ownership or control of property by virtue of its function as a sovereign.* [40 CFR 300.1105; emphasis supplied.]

In none of the specifically enumerated instances

in which transfers of land are expressly deemed "involuntary"—"acquisitions pursuant to abandonment proceedings, or as the result of tax delinquency, or escheat"—does the government accept the property in question under duress or compulsion.

Further, even the involuntary transfers referred to in the statute do not require that the acquiring government remain completely passive in the process of acquiring land "involuntarily." Rather, acquiring property through abandonment proceedings, tax forfeitures, and escheat all require some active government involvement. See, e.g, MCL 567.11; MSA 26.1053(1) (Attorney General shall take charge of all matters pertaining to lands or property subject to escheat or escheatable because owner dies intestate or has been missing for five years); MCL 567.12; MSA 26.1053(2) (treasury department shall investigate and make inquiry into every county to ascertain whether there is any abandoned, escheated, or escheatable property); MCL 567.13; MSA 26.1053(3) (Attorney General shall protect the interests of the state in escheated or escheatable property); MCL 205.25; MSA 7.657(25) (commissioner may seize and sell real property to satisfy tax debt).

Michigan's assumption of ownership of the Great Lakes bottom lands is the clearest possible example of a state's acquisition of land "by virtue of its function as a sovereign," a phrase not significantly distinguishable from the MERA's language, "by virtue of its government function." Congress, which had previously controlled all land not already in private hands, granted Michigan control of that land as a benefit of statehood. The distinction between "patented" (previously granted) and "unpatented" (unassigned) land is crucial. Congress could not give to the people of Michigan that

which was already owned by individuals, but it could give land owned by the people of the United States to the people of Michigan as a whole. The state took control of the lake bottom lands solely because it was a government. Michigan's agreement to the change in ownership[7] did not alter the governmental character of the action.

Moreover, a governmental unit must be "actively involved" before CERCLA liability can be imposed on it. In *United States v Azrael,* 765 F Supp 1239 (D Md, 1991), the defendants asserted counterclaims against the EPA and the State of Maryland for actions taken during efforts to clean up a disposal site. The court rejected those claims, holding that "[a]llowing contribution counterclaims in this situation would undermine Congress' intent to ensure that those who benefit financially from a commercial activity should internalize the health and environmental costs of that activity into the costs of doing business." *Id.* at 1245. The court also declined to adopt the defendants' position, because "permitting contribution counterclaims against [governmental agencies] would create a new defense," when the legislative history of the CERCLA "makes clear that Congress intended that liability . . . was to be subject to *only* those [enumerated] defenses" in the statute. *Id.* See also *Stilloe v Almy Brothers, Inc,* 782 F Supp 731, 736 (ND NY, 1992) (when a state is acting solely in its capacity to clean up a hazardous waste site, it does not incur CERCLA liability); *United States v Western Processing Co, Inc,* 761 F Supp 725, 730 (WD Wash, 1991) (the EPA does not assume risk of becoming liable as an owner or operator when "[its] regulatory efforts at hazard-

---

[7] "[T]he interest and prosperity of the state will be greatly advanced by our immediate admission into the union." Michigan Assent to Condition of Admission, December 15, 1836.

ous waste sites are less than successful);" *New York v City of Johnstown,* 701 F Supp 33, 36 (ND NY, 1988) (the defendant brought counterclaim for contribution, alleging negligence in regulation of landfills; the court said that liability "ends with that party who both owned the hazardous waste and made the crucial decision how it would be disposed of"). Compare *CPC Int'l, Inc v Aerojet-General Corp,* 731 F Supp 783, 791-792 (WD Mich, 1989), where the DNR became subject to third-party liability because it was "actively involved" in removing toxins from a contaminated site.

Although *Azrael, Stilloe,* and *Western Processing* are not squarely on point, because the liability alleged involved "operating" and not merely owning the contaminated site, they are persuasive. If federal courts have refused to find liability on the part of governmental agencies that have had some actual interaction with the hazardous waste site, then surely they would not find liability on the part of states that are merely passive owners of land that became contaminated at some time during the period of ownership. "[W]here an entity falls within the technical description of a responsible party but has little or no connection with the creation of the hazardous condition, the imposition of CERCLA liability may be unwarranted." *Philadelphia v Stepan Chemical Co,* 544 F Supp 1135, 1143, n 10 (ED Pa, 1982).

MCL 299.603(u)(ii); MSA 13.32(3)(u)(ii) excuses a defendant from liability under the MERA for environmental contamination that it did not itself cause to occur. Plaintiff has no contribution claim against defendant, because § 612c(3) allows contribution actions only against "person[s] who [are] or may be liable." The court correctly dismissed this count of plaintiff's complaint for failure to state a claim.

### III. RELIEF UNDER THE MERA

The third count of plaintiff's original complaint sought "declaratory judgment under MERA" and claimed that defendant is "strictly liable" to plaintiff. Because we have already determined that the state of Michigan cannot be liable to plaintiff under the MERA, this question is moot.[8]

Plaintiff's final count sought to institute a "citizen's suit" for equitable relief under MCL 299.615; MSA 13.32(15). This claim was improper for reasons of both jurisdiction and standing.

MCL 299.615; MSA 13.32(15) provides:

(1) . . . [A] person . . . whose health or enjoyment of the environment is or may be adversely affected by a release from a facility or threat of release from a facility . . . [or] by a violation of this act or a rule promulgated or order issued under this act . . . may commence a civil action against any of the following:

(a) An owner or operator for injunctive relief necessary to prevent irreparable harm to the public health, safety, or welfare, or the environment from a release or threatened release in relation to that facility.

\* \* \*

(3) An action shall not be filed under subsection (1)(a) or (b) unless all of the following conditions exist:

(a) The plaintiff has given at least 60 days' notice in writing of the plaintiff's intent to sue, the basis for the suit, and the relief to be requested to each of the following:

(i) The department.

(ii) The attorney general.

(iii) The proposed defendants.

---

[8] Defendant discusses at length why sovereign immunity protects it from plaintiff's claims. Because the circuit court did not rule on this issue, we do not reach the issue.

Federal courts have found the sixty-day notice requirement in 42 USC 9659 to be jurisdictional. See *Roe v Wert,* 706 F Supp 788, 789 (WD Okla, 1989). Plaintiff argues that the presence of ¶ 45 in its original complaint served as the required notice. We disagree.

First, the statute requires notice not only of the plaintiff's intent to sue, but also "the basis for the suit and the relief to be requested." MCL 299.615(3)(a); MSA 13.32(15)(3)(a). Plaintiff's "notice" read:

> [Plaintiff intends] to sue for injunctive relief for the present protection of the public health, safety or welfare, or the environment from a release or threatened release as described under MERA.

This notice was not sufficient to satisfy the requirements of § 615(3)(a). "Injunctive relief" is an extremely broad descriptor. What was plaintiff planning to ask the court to enjoin or require? How was this relief going to protect. . . the public health, safety, or welfare? The DNR itself was already acting to protect the public by having the contaminants identified and removed.

In addition, no "release" was imminent. The releases involved had occurred long before plaintiff filed its complaint. Section 3(x) of the MERA, MCL 299.603(x); MSA 13.32(3)(x), provides:

> "Release" includes, but is not limited to, any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing of a hazardous substance into the environment, or the abandonment or discarding of barrels, containers, and other closed receptacles containing a hazardous substance.

The "spilling, leaking . . . discharge," etc., of

sludge into Lake Michigan happened while Heywood-Wakefield used the site and certainly no later than 1982. At most, the sludge might continue to migrate. The mere migration of waste is not "disposal" under the CERCLA. See *Snediker Developers Limited Partnership v Evans,* 773 F Supp 984, 989 (ED Mich, 1991). Consequently, plaintiff cannot have been seeking an injunction to forestall a "release." Further, plaintiff has not pleaded that it also complied with the requirements of notification of the Attorney General and the DNR set out in MCL 299.615(3)(a),(b); MSA 13.32(15)(3)(a),(b). The circuit court lacked jurisdiction to consider plaintiff's defective claim. Dismissal under MCR 2.116(C)(4) was proper.

Plaintiff also lacked standing to assert its proposed claim. Section 15 provides that "a person . . . whose health or enjoyment of the environment is or may be adversely affected by a release from a facility or threat of release" may bring suit. Plaintiff is not a person whose health may be affected. Rather, plaintiff is seeking relief only from the monetary costs associated with the release caused by Heywood-Wakefield. Plaintiff, therefore, is not within the class of persons who may seek relief under the provisions of MCL 299.615; MSA 13.32(15). The court correctly dismissed the fourth count of plaintiff's complaint pursuant to MCR 2.116(C)(5).

To summarize:

1. Count I was properly dismissed

(a) pursuant to MCR 2.116(C)(8), because the trial court lacked jurisdiction when plaintiff presented a claim before the DNR had brought an action for recovery costs and there was no actual controversy between the parties, and

(b) pursuant to MCR 2.116(C)(8), because defen-

dant's alleged ownership of the lake bottom is legally irrelevant to plaintiff's potential liability.

2. Count II was properly dismissed pursuant to MCR 2.116(C)(8), because defendant cannot be liable for contribution under the MERA.

3. Count III was properly dismissed pursuant to MCR 2.116(C)(8), because defendant had no potential liability under the MERA and, thus, no equitable relief could have been granted.

4. Count IV was properly dismissed pursuant to MCR 2.116(C)(4) and 2.116(C)(5), because plaintiff's claim did not plead facts to establish jurisdiction under § 15 of the MERA and plaintiff did not have standing to assert such a claim.

Affirmed. No costs, a public question being involved.